MANASQUAN RIVER REGIONAL SEWERAGE AUTHORITY, A BODY POLITIC AND CORPORATE OF THE STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. OCEAN COUNTY UTILI-TIES AUTHORITY, A BODY POLITIC AND CORPORATE OF THE STATE OF NEW JERSEY, DEFENDANT AND THIRD–PARTY PLAINTIFF–RESPONDENT, v. BOLAND, SAFFIN, GORDON & SAUTTER, THIRD–PARTY DEFENDANT.

Argued January 17, 1989—Decided July 6, 1989.

*Charles E. Starkey* argued the cause for appellant (*Starkey, Kelly, Blaney & White*, attorneys).

*Richard H. Woods* argued the cause for respondent (*Hiering, Dupignac & Barnes*, attorneys).

PER CURIAM.

The members of the Court being equally divided, the judgment of the Appellate Division, 234 *N.J.Super.* 530 is affirmed.

HANDLER, POLLOCK and GARIBALDI, JJ.,
concurring.

We would affirm the judgment of the courts below substantially for the reasons expressed in the opinion of the Appellate Division, reported at 234 *N.J.Super.* 530 (1988).

STEIN, J., dissenting.

In this case the Manasquan River Regional Sewerage Authority (Manasquan) alleged that a 111% rate increase imposed on it in 1984 by the Ocean County Utilities Authority (Ocean) was unlawful to the extent that it reflected rates lower than those required by law during the period prior to Manasquan's affiliation with Ocean. The trial court ruled that the Manasquan/Ocean service agreement, which provided that Manasquan's rates could not be more favorable than the rates of

other users, superseded any illegality inherent in Ocean's rate structure prior to Manasquan's affiliation. Based largely on that legal conclusion, the trial court granted Ocean's motion for summary judgment, and the Appellate Division affirmed. 234 *N.J.Super.* 530 (1988). This Court granted Manasquan's petition for certification, 111 *N.J.* 610 (1988), and now affirms on the basis of the opinion below. I dissent.

### I.

Manasquan, a regional sewerage authority, was created by parallel ordinances adopted by the Boroughs of Freehold and Farmingdale, and the Townships of Freehold, Howell, and Wall, in Monmouth County. Manasquan was established to provide for the collection and treatment of wastewater in western Monmouth County at the headwaters of the Manasquan River.

Ocean, the respondent and third-party plaintiff, was originally established in 1970 as the Ocean County Sewerage Authority, but was reconstituted as the Ocean County Utilities Authority in 1978. Ocean was created to provide for the collection and treatment of wastewater throughout Ocean County. Third-party defendant, Boland, Saffin, Gordin & Sautter, was Ocean's financial consultant.

From its inception, Manasquan had planned to construct a sewerage-treatment facility in Monmouth County. The Manasquan plan required the approval of both the United States Environmental Protection Agency (EPA) and the New Jersey Department of Environmental Protection (DEP). While Manasquan was pursuing the necessary approvals, Ocean proposed to both agencies that Manasquan sewage be diverted to Ocean's northern treatment facility for processing.

In August 1980, DEP's Division of Coastal Resources conducted a public hearing to review Manasquan's proposal to construct its own treatment facility. At the hearing, DEP officials suggested that diverting the Manasquan flow to the Ocean treatment facility would eliminate environmental prob-

lems resulting from the discharge of treated wastewater into
the Manasquan River. Subsequently, DEP retained an indepen-
dent engineering firm to prepare a report on the proposed
diversion to Ocean's treatment plant.

Among other conclusions, the DEP consultant's report deter-
mined that Ocean could absorb Manasquan's flow without a
significant rate increase:

> The OCUA user charge of $850 per million gallons which became effective
> January 1, 1981 is expected to remain constant for approximately four years.
> We have made the assumption that future increases in this charge will approxi-
> mate the rate of inflation and therefore is consistent with the cost methodolo-
> gies used throughout this analysis since all costs have been brought to January
> 1981 with no adjustment for future inflation.

Relying on its consultant's report, DEP concluded that the
Manasquan flow should be diverted to Ocean's northern treat-
ment facility. Consequently, DEP and EPA denied Manasquan
the funding necessary to construct its own facility.

Manasquan and Ocean entered into a service agreement in
September 1981. Section 702 of the agreement provides that
Ocean may not enter into a service contract with any other
entity on terms more favorable than those provided to Manas-
quan. Section 502 provides that the annual rates imposed by
Ocean shall be "uniform" to all participants in the Ocean
district and such rates "shall not be more favorable" to the
Manasquan users.

When the Manasquan/Ocean service agreement was signed,
Ocean charged a bulk rate of $850 per million gallons of
wastewater. This rate became effective January 1, 1981, and
was an increase over the rate of $625 that had existed since
1976. During the period prior to the Manasquan/Ocean agree-
ment, Ocean officials represented to Manasquan, its own cus-
tomers, the EPA and the DEP that the $850 rate would remain
stable until 1985, based on the current rate of inflation. In
1983, however, Ocean sought an additional rate hike, this time
more than doubling the $850 rate to $1,800 per million gallons.
This rate became effective January 1, 1984.

Manasquan alleges that Ocean's 1984 rate increase was required largely to cover past operating deficits. According to Manasquan, from 1976, when a portion of Ocean's system became functional, through 1983, Ocean failed to charge its users annual rates adequate to cover costs of operation, maintenance, and debt service attributable to the operational portion of the system. As a result, Ocean experienced large annual deficits, which it funded with the proceeds of short-term notes. These deficits were capitalized on Ocean's financial statements and recorded in an account entitled "construction-in-progress."

Portions of the record before the trial court on the summary judgment motion appear to lend support to Manasquan's allegations. Thus, the 1982 audit report of Arthur Young & Company, prepared in anticipation of Ocean's $207,000,000 refunding-bond issue, criticized Ocean's capitalization of operating deficits as a practice that "differs from generally accepted accounting principles." Accordingly, the Arthur Young audit report made adjustments in Ocean's financial statements in order "to properly establish fund balances (deficits) at January 1, 1982 to reflect results of operations, interest income and interest expense *from phased project completion.*" (Emphasis added.) The interest-expense adjustment at January 1, 1982, totaled $38,097,662, and the unfunded interest expense incurred in the year 1982 was an additional $16,001,732. Stated simply, the import of the auditor's adjustments was that Ocean's customers had enjoyed the benefit of a completed sewer system without paying interest on debt attributable to the facility they were using.

Moreover, an analysis of Ocean's financial statements by accountants retained by Manasquan concluded that Ocean's total operating deficit through March 1985, attributable to its inadequate rate structure prior to Manasquan's affiliation with Ocean, was $64,933,230. Manasquan's accountants concluded that the effect of the increased rates would cause Manasquan's users to pay off approximately thirty million dollars of that deficit over the period in which Ocean's permanent refunding bonds were outstanding.

When Ocean raised its rate from $850 to $1,800 per million gallons, Manasquan filed this action seeking damages and a new rate schedule. Manasquan alleged that it relied on Ocean's representation of facts regarding projected rates that Ocean "knew or should have known were inaccurate and misleading." Specifically, Manasquan alleged that because of Ocean's failure to charge adequate rates since 1976, Ocean knew or should have known that the $850 rate was wholly inadequate and would not remain in effect through 1984. Further, Manasquan alleged that Ocean's failure to charge its users rates sufficient to cover operating costs on the functional portions of Ocean's system was contrary to law and constituted an improper diversion of past costs to future users. Ocean filed a third-party complaint against its financial consultant, Boland, Saffin, Gordon & Sautter. Ocean alleged that any liability resulting from the Manasquan suit was a consequence of the consultant's fraudulent or negligent actions or advice.

Ocean moved for summary judgment. Ocean asserted that the rates charged to Manasquan were "uniform" with those of other participating municipalities in accordance with the service agreement. The trial court granted Ocean's motion for summary judgment. In construing the contract, the court concluded that Manasquan could not be charged a rate "more favorable" than that charged to any other participant in Ocean's system, notwithstanding any factual issue concerning the adequacy or legality of Ocean's rates prior to Manasquan's affiliation. In the opinion of the trial court, no fraud existed because the rate projections were mere "predictions," and "there was no fraudulent action taken to prevent Manasquan from discovering any information it deemed necessary." The Appellate Division affirmed, holding that the statements concerning rates were merely approximations and not material misrepresentations. The court also rejected plaintiff's allegation that the rate increase resulted from illegally inadequate rates prior to Manasquan's affiliation, concluding that the service agreement man-

dated uniform rates irrespective of the inadequacy of Ocean's prior rates.

## II.

Ocean was organized under the Sewerage Authorities Law, *N.J.S.A.* 40:14A–1 to 40:14A–37, and reorganized in 1978 under the Municipal and County Utilities Authorities Law, *N.J.S.A.* 40:14B–1 to 40:14B–69. Both statutes mandate that Ocean impose rates on its users that are adequate to pay the costs of operation, maintenance, and debt service on Ocean's sewerage system. *See N.J.S.A.* 40:14A–8(c); *N.J.S.A.* 40:14B–23.[1] The succinct reference to this requirement in the legislative history of the Sewerage Authorities Law explains that its purpose was to assure that such authorities are self-sustaining:

> [T]o meet operating costs and all payments on the bonds * * * the authority will charge sufficient service charges and collect them from the direct or indirect users of its sewage disposal works, and accordingly its operations will be on a self-supporting basis, with the result that the necessary sanitation projects will be acquired and financed without increasing the tax burden * * *. [Sponsor's Statement to S. 262, *L.*1946, *c.* 138.]

*See also Airwick Indus., Inc. v. Carlstadt Sewerage Auth.*, 57 *N.J.* 107, 120 (1970) ("It is therefore seen that the purpose of the annual charge is to raise a sum sufficient to pay (1) all expenses of operation and maintenance and (2) the principal and interest on any bonds and to maintain reserves or sinking funds for the funding of the Authority debt."), *cert.* denied, 402 *U.S.* 967, 91 *S.Ct.* 1666, 29 *L.Ed.*2d 132 (1971); *Hamilton Township Auth. v. Apple Tree Corp.*, 202 *N.J. Super.* 440, 443 (App.Div.)

---

[1] In addition to its statutory obligations, Ocean was required, pursuant to its agreement with Ocean County, to charge rates sufficient to pay the costs of operations, maintenance, and debt service. That agreement provided that in any year in which Ocean operated at a deficit, Ocean County would pay an annual charge in an amount sufficient to make up the deficit. Ocean was obligated to repay the county prior to the end of the fiscal year following the year in which the deficit was incurred. It appears from the record that Ocean never exercised its right to impose a surcharge on Ocean County to cover its operating deficits.

("Section 23 [*N.J.S.A.* 40:14B–23] mandates that the revenues of the municipal authority at all times should be 'adequate to pay the expenses of operation and maintenance of the utility system.' Thus, the combination of service charges and connection fees combined must be sufficient to run the system."), certif. denied, 102 *N.J.* 327 (1985).

The significance of the legislative mandate that authorities such as Ocean impose annual charges sufficient to meet expenses is underscored by the Legislature's enactment of the Local Authorities Fiscal Control Law, *L.*1983, *c.* 313 (codified at *N.J.S.A.* 40A:5A–1 to 40A:5A–27). Although its effective date was subsequent to most of the critical events in this case, see note following *N.J.S.A.* 40A:5A–1, this statute subjected the annual budgets of local authorities such as Ocean to review and approval by the Local Finance Board. That body is specifically required to consider in the approval process whether revenues are sufficient to pay operating expenses, debt service, and reserve requirements. *N.J.S.A.* 40A:5A–11; *see also N.J.A.C.* 5:31–2.1(c) ("The total budget appropriations shall not exceed total anticipated revenues reasonably expected to be realized."). In the event of a deficit, the Local Finance Board is empowered to order the authority to increase rates, or to issue temporary or emergency notes, which must be retired or refinanced by the close of the succeeding fiscal year. *N.J.S.A.* 40A:5A–12 to 40A:5A–14. The provisions of the Fiscal Control Law are reflective of the Legislature's intention to "strengthen the existing system of State oversight of local financial operations" by providing a "proven system of financial regulation to a now largely unregulated area of local debt financing." Senate County and Municipal Government Committee Statement to A.144, *L.*1983, *c.* 313.[2]

---

[2]Enactment of the Local Authorities Fiscal Control Law was prompted in part by an investigation of local sewerage and utility authorities conducted by the New Jersey State Commission of Investigation. See Report and Recom-

Examined in the context of this strong legislative and regulatory policy against deficit financing by county and municipal authorities, it is self-evident that plaintiff's allegations, if proved at trial, would require the fashioning of an appropriate remedy to relieve Manasquan's users of an impermissible financial burden. I do not regard the "uniformity" provisions of the Ocean/Manasquan service agreement to be dispositive of the legality of an alleged attempt by Ocean to saddle Manasquan with deficits that accrued prior to its affiliation. Applying the most basic maxim of contract interpretation, an examination of this contract in the context in which it was executed could not conceivably support the conclusion that the parties intended that Manasquan would share the burden of Ocean's past deficits, to the extent of some thirty million dollars. *Cf. Onderdonk v. Presbyterian Homes of New Jersey*, 85 *N.J.* 171, 183 (1983) ("Intent may be determined by examination of the contract and in particular the setting in which it was executed.").

Even more to the point, however, is the settled principle that forbids enforcement or construction of a contract in a manner that is incompatible with the laws or public policies of this state. *See, e.g., IMO Baby M*, 109 *N.J.* 396, 434–41 (1988); *Vasquez v. Glassboro Serv. Ass'n*, 83 *N.J.* 86, 98–99 (1980); *Manning Eng'g, Inc. v. Hudson County Park Comm'n*, 74 *N.J.* 113, 138 (1977); *Henningsen v. Bloomfield Motors, Inc.*, 32 *N.J.* 358, 403–04 (1960). Viewed indulgently, as is required in the context of a summary judgment motion, *see Portee v. Jaffee*, 84 *N.J.* 88, 90–91 (1980), plaintiff alleges conduct by Ocean violative of both law and public policy. Plaintiff asserts that Ocean engaged in illegal deficit financing for a number of years during the period prior to the enactment of the Local Authorities Fiscal Control Law, *L.*1983, *c.* 313, which for the first time subjected its budgets to State supervision. Plaintiff alleges that Ocean continued to capitalize interest on debt

mendations of the State Commission of Investigation on County and Local Sewerage and Utility Authorities (Mar. 15, 1983).

relating to completed portions of its system until, in anticipation of a permanent bond issue, Arthur Young & Co. adjusted its records to conform with generally-accepted accounting principles by charging unfunded interest expense with approximately fifty-four million dollars, two-thirds of which was previously capitalized as "construction-in-progress." According to Manasquan, Ocean's 1984 rate increase would have the effect of imposing a large portion of the cost of Ocean's improperly capitalized interest expense on Manasquan's rate payers. Unquestionably, if these allegations are proved, Ocean's attempt to shift the cost of a substantial portion of its prior operating deficits to Manasquan's users would be in contravention of state law and public policy, and the Ocean/Manasquan service contract should not be construed to permit that result.

### III.

The lower courts also dismissed Manasquan's fraud count, based on alleged fraudulent misrepresentations concerning future rates, concluding that the rate projections were mere "predictions" and thus not reasonably relied on. In my view, Manasquan should be permitted to prove its claim.

Even a prediction about future events, if made in bad faith to induce action or reliance, can be actionable. As the Restatement of Contracts explains:

[A] promise or a prediction of future events may by implication involve an assertion that facts exist from which the promised or predicted consequences will follow, which may be a misrepresentation as to those facts. Thus, from a statement that a particular machine will attain a specified level of performance when it is used, it may be inferred that its present design and condition make it capable of such a level. Such an inference may be drawn even if the statement is not legally binding as a promise. [*Restatement (Second) of Contracts* § 159 comment c (1981).]

Thus, one who receives an opinion or a prediction may assume that it is not inconsistent with facts known by the person making the assertion:

§ 168. Reliance on Assertions of Opinion

(1) An assertion is one of opinion if it expresses only a belief, without certainty, as to the existence of a fact or expresses only a judgment as to quality, value, authenticity, or similar matters.

(2) If it is reasonable to do so, the recipient of an assertion of a person's opinion as to facts not disclosed and not otherwise known to the recipient may properly interpret it as an assertion

  (a) that the facts known to that person are not incompatible with his opinion, or

  (b) that he knows facts sufficient to justify him in forming it.

  [*Id.* at § 168.]

Although a cause of action will not lie merely because an opinion or prediction was false, it can be sustained if the opinion or prediction was asserted with the knowledge that it was false. *See id.* at § 168 comment d, illustrations 3, 5, and 6; 37 *Am.Jur.* 2d *Fraud and Deceit* § 59 (1968); 17 *C.J.S. Contracts* §§ 156, 157 (1963); W. Keeton, D. Dobbs, R. Keeton, D. Owen, *Prosser and Keeton on The Law of Torts* § 109 (5th ed. 1984); *accord Hobart v. Hobart Estate Co.,* 26 *Cal.*2d 412, 430–34, 159 *P.*2d 958, 968–69 (1945); *Cristallina S.A. v. Christie, Manson & Woods Int'l, Inc.,* 117 *A.D.*2d 284, 293–96, 502 *N.Y.S.*2d 165, 172–73 (1984); *cf. Van Dam Egg Co. v. Allendale Farms, Inc.,* 199 *N.J.Super.* 452, 458 (App.Div.1985) (expression of opinion that defendant had capacity to pay for goods is actionable where declarant knew defendant was insolvent).

Similarly, our courts have held representations of future intentions to be actionable if the declarant knew at the time the representation was made that it could not be performed.

Misrepresentation of a present state of mind, with respect to a future matter, may be concluded from the utter recklessness and implausibility of the statement in light of subsequent acts and events; from a showing that at the time of the making of the promise, the promisor's intention to perform was dependent upon contingencies known to the promisor and unknown to the promisee; or from circumstances indicating that the promisor must have known at the time of his promise that he could not or would not fulfill it. [*Ocean Cape Hotel Corp. v. Masefield Corp.,* 63 *N.J.Super.* 369, 381 (App.Div.1960) (citations omitted).]

*Accord Roberts v. James,* 83 *N.J.L.* 492, 497–98 (E. & A. 1912); *Landriani v. Lake Mohawk Country Club,* 26 *N.J.Super.* 157 (App.Div.1953); *Samatula v. Piechota,* 142 *N.J.Eq.* 320, 323

(Ch.1948); *Zuckerman v. Geller*, 103 *N.J.Eq.* 145, 146 (Ch. 1928).

Manasquan alleges that when Ocean's officials represented or "predicted" that the $850 rate could be maintained in the future, they were aware of facts—specifically, the existence of approximately sixty million dollars in unfunded deficits—that precluded fulfillment of that prediction. In the context of this record, it was error to bar Manasquan from attempting to prove those allegations.

## IV.

I would reverse the judgment of the Appellate Division and remand the matter for trial.

Chief Justice WILENTZ and Justice CLIFFORD join in this opinion.

*For affirmance*—Justices HANDLER, POLLOCK and GARIBALDI—3.

*For reversal*—Chief Justice WILENTZ, and Justices STEIN and CLIFFORD—3.