# United States Tax Court

T.C. Memo. 2024-70

PATRICIA COTRONEO,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 29638-14.                    Filed June 24, 2024.

————

*Frank Agostino*, *Hana M. Boruchov*, and *Eugene Kirman*, for petitioner.

*Shawna A. Early*, *Carmen N. Presinal*, and *Rachel L. Schiffman*, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, *Judge*: Respondent determined a deficiency in Frank L. Cotroneo and petitioner's (together, Cotroneos) 2012 federal income tax of $15,288 and an accuracy-related penalty for a substantial understatement of income tax under section 6662(a)[1] and (b)(2) of $3,058.[2] The issues for decision are whether petitioner (1) failed to report $122,500 of taxable individual retirement account (IRA) distributions, $6,987 of taxable Social Security income, and $144 of partnership income; (2) is liable for a section 6662(a) and (b)(2) accuracy-related penalty for a substantial understatement of income tax; and

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

[2] Petitioner and Mr. Cotroneo jointly filed for 2012, but only petitioner filed a Petition for redetermination of the deficiency, which included a claim for relief under section 6015.

[*2] (3) is entitled to relief from joint and several liability for the deficiency and the penalty pursuant to section 6015(b), (c), or (f).

## FINDINGS OF FACT

Some of the facts are stipulated and are so found. The Stipulation of Facts and its Exhibits are incorporated herein by this reference. Petitioner resided in New Jersey when she timely filed her Petition.

Petitioner has an undergraduate degree in theater arts. She married Mr. Cotroneo in 1988 and was married to him as of the time of trial. Until her first child was born in 1990 petitioner worked as an actress in television commercials and soap operas. From 1990 until 2012 she was a homemaker. Mr. Cotroneo worked as an insurance broker and was the primary source of income for the household. He made the decisions concerning large purchases and investments.

In 2010 Mr. Cotroneo was indicted by the U.S. Attorney for the District of New Jersey for bribery and tax evasion. The charges included an allegation that Mr. Cotroneo did not report over $1,500,000 in income for taxable years 2005 through 2007, resulting in tax deficiencies totaling over $570,000. The indictment alleged that this unreported income consisted of the following amounts that a sham corporation[3] paid to third parties on Mr. Cotroneo's behalf: (1) over $200,000 for his personal credit card bills, (2) $41,400 in golf club membership fees, and (3) $571,000 in landscaping and remodeling costs for the Cotroneos' jointly owned residence in Bernardsville, N.J. (Bernardsville residence). The indictment also alleged that Mr. Cotroneo would be subject to (1) forfeiture of property that constituted, or was acquired with, any proceeds he received through the bribery scheme or (2) if such property had been transferred, commingled, lost, or substantially diminished in value, then forfeiture of his other property equal to the value of the first described forfeitable property.

On July 28, 2010, Mr. Cotroneo accepted a plea agreement in which he pleaded guilty to one count of bribery and one count of tax evasion with respect to 2007. As part of his plea agreement, Mr. Cotroneo agreed to (1) file amended returns for 2005, 2006, and 2007, (2) pay any additional tax owed for those years, and (3) forfeit to the United States all property, real and personal, that constituted or

---

[3] This sham corporation was controlled by another insurance broker with whom Mr. Cotroneo perpetrated a bribery scheme. The corporation paid Mr. Cotroneo for his participation in the bribery scheme.

[*3] was derived from proceeds traceable to the commission of the bribery offense.[4]  Petitioner was aware of Mr. Cotroneo's foregoing obligations.

On February 10, 2011, the Cotroneos sold the Bernardsville residence for $3,300,000.[5]  After satisfaction of the Cotroneos' liabilities under mortgages on the residence, outstanding judgments, and other expenses, they received net proceeds of $151,000 from the sale.  An attorney, Thomas E. Dooley, represented the Cotroneos in the sale.

On the same day the Cotroneos sold the Bernardsville residence, a residence in Chester, N.J. (Chester residence),[6] was purchased in petitioner's name alone for $950,000 in cash from the following sources: $110,000 from her mother, $151,000 from the Bernardsville residence's sale proceeds, and the balance, $689,000, from Mr. Cotroneo.  The deed for the Chester residence indicates that Thomas E. Dooley represented petitioner in the purchase.  Just eight days earlier, on February 2, 2011, Mr. Cotroneo had withdrawn $304,000 from an IRA he held at Morgan Stanley Smith Barney, LLC (Morgan Stanley).  The beneficiary of the withdrawal was the Thomas E. Dooley Trust.

Petitioner, her mother, and Mr. Cotroneo were present at the closing for the Chester residence purchase.  At petitioner's insistence,

---

[4] When Mr. Cotroneo was later sentenced in January 2014, he was ordered to (1) forfeit $9,126,200 to the United States, representing the proceeds he derived from the bribery scheme between 2005 and 2010, and (2) make restitution of $3,275,678 to the U.S. Treasury for distribution to the Toms River Regional School District (an employee of which had been bribed by Mr. Cotroneo and others), representing the loss the school district suffered as a result of the bribery scheme.

[5] Although the parties stipulated that the sale of the Bernardsville residence occurred on February 2, 2011, the stipulation is contradicted by a settlement document in evidence, which establishes the sale date as February 10, 2011.  We are not obliged to accept a stipulation between the parties when it is clearly contrary to facts disclosed by the record.  *Cal-Maine Foods, Inc. v. Commissioner*, 93 T.C. 181, 195 (1989).

[6] We take judicial notice that the closing date for the purchase of the Chester residence was February 10, 2011.  This finding is based on a copy of the deed recorded in Morris County, New Jersey's publicly available electronic real estate records, which respondent brought to the Court's attention in supplemental briefing.  We take judicial notice of the deed and its contents.

A court may take judicial notice of appropriate adjudicative facts at any stage in a proceeding whether or not the parties request it.  *See* Fed. R. Evid. 201(c) and (d).  In general, the court may take notice of facts that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.  *Id.* subdiv. (b).

[*4] title to the Chester residence was placed solely in her name because she was aware that Mr. Cotroneo had obligations that might attach to the residence were his name on the title. As of the time of trial, the Chester residence's legal title remained in petitioner's name alone and unencumbered by any indebtedness.

As noted, at the time of the purchase of the Chester residence, Mr. Cotroneo had pleaded guilty to bribery and tax evasion charges and agreed to the forfeiture to the United States of all property that constituted, or was acquired with, any proceeds he received through the bribery scheme and to pay any additional taxes owed as a result of his tax evasion. His sentencing did not occur until January 2014, at which time he was ordered to pay over $12 million to the United States, approximately $9 million of which constituted the proceeds he derived from the bribery scheme in which he had participated. *See supra* note 4.

Petitioner began working as a grocery store cashier in September 2012, earning $2,133 in wages that year. The Cotroneos also received $8,220 of combined Social Security benefits in 2012.

The record contains the following Morgan Stanley certified business records with respect to the IRA Mr. Cotroneo held there: (1) a 2012 Form 1099–R, Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc., issued by Morgan Stanley to Mr. Cotroneo on February 11, 2013, (2) an IRA consolidated distribution form for a July 9, 2012, withdrawal of $10,000 by Mr. Cotroneo, (3) withdrawal activity statements outlining the withdrawals made by Mr. Cotroneo from the IRA for 2011, 2012, and 2013, and (4) six outgoing wire transfer request forms for withdrawals made by Mr. Cotroneo from February 27 through July 6, 2012, totaling $90,000. The Morgan Stanley records further indicate that Mr. Cotroneo's IRA was a rollover account.

The 2012 Form 1099–R issued to Mr. Cotroneo lists both a "Gross distribution" and "Taxable amount" of $122,500, and box 2b, "Taxable amount not determined," is checked. On the July 9, 2012, IRA consolidated distribution form, on which Mr. Cotroneo requests a "Normal (age 59½ and older)" distribution of $10,000 from his "Traditional IRA" account, he states that he was born in August 1950. This form is not signed by a Morgan Stanley manager and states that such a signature is "Required for 72(t) distributions only."

**[*5]** The withdrawal activity statement for 2011 lists a $304,000 withdrawal via wire transfer to the Thomas E. Dooley Trust on February 2, 2011. The withdrawal activity statement for 2012 lists 12 distributions made in 2012 totaling $122,500: (1) six wire transfers made to Mr. Cotroneo between February 27 and July 6, 2012, totaling $90,000, (2) five branch checks issued to him between July 9 and November 20, 2012, totaling $30,500, and (3) one distribution to an unknown account on December 27, 2012, for $2,000. All six outgoing wire transfer request forms list each withdrawal as a normal, taxable, partial distribution of funds. One of these forms, dated March 14, 2012, is signed by both Mr. Cotroneo and "Charlene L. Miles, First Vice President, Sr. Complex Service Manager," a Morgan Stanley manager.

During 2012 petitioner maintained a personal checking account. Mr. Cotroneo deposited money into the account throughout 2012 to cover the living expenses of the Cotroneos and their children, including those for the Chester residence. Petitioner was aware that Mr. Cotroneo was making these deposits. During 2012, $98,556.68 was deposited into the account, and petitioner wrote checks totaling $99,450.28 from it.

John Hauspurg, a certified public accountant, prepared the Cotroneos' 2012 Form 1040, U.S. Individual Income Tax Return. The Cotroneos did not provide him with a Form 1099–R or a Schedule K–1, Partner's Share of Income, Deductions, Credits, etc., for 2012. The 2012 return reported total income of $34,633, including $8,220 in nontaxable Social Security benefits. The return reported an IRA distribution of $10 and no partnership income. Petitioner signed the 2012 return without examining it or asking Mr. Cotroneo or Mr. Hauspurg about its contents.

As noted, Mr. Cotroneo was sentenced with respect to the bribery and tax evasion charges on January 6, 2014, and he was incarcerated from February 18, 2014, through March 18, 2017.

On July 21, 2014, respondent's Automated Underreporter (AUR) program sent the Cotroneos a Notice CP2000, Proposed Changes to Your 2012 Form 1040. The Notice CP2000 carried an AUR control number. The Notice proposed changes to the 2012 return on the basis of income information reported to respondent by third parties that differed from the amounts shown on the return. The Notice further stated that if the proposed changes were correct, the Cotroneos had a deficiency and substantial understatement penalty of $15,288 and $3,058, respectively, for 2012.

[*6] On September 1, 2014, an AUR operations manager sent petitioner and Mr. Cotroneo a letter regarding their 2012 taxable year. The letter stated in part: "Thank you for your response of July 7, 2014."

On September 11, 2014, an Internal Revenue Service (IRS) innocent spouse operations manager mailed petitioner a preliminary determination proposing to deny her any relief under section 6015(c) and (f) for 2012. On September 15, 2014, respondent issued a Notice of Deficiency for 2012 to the Cotroneos. The Notice bore an AUR control number. The Notice determined that the 2012 return failed to report (1) $122,500 of taxable retirement income reported by Morgan Stanley, (2) $144 of partnership income reported by "Atlas Energy Nineties Series 18 LTD," and (3) $6,987 of taxable Social Security benefits reported by the Social Security Administration. These and other adjustments resulted in the same deficiency and substantial understatement penalty listed in the Notice CP2000.

Petitioner, through counsel, timely petitioned for redetermination and asserted as an affirmative defense her entitlement to relief under section 6015(b) and/or (f). Subsequently, in a Pretrial Memorandum filed shortly before trial, petitioner also claimed entitlement to relief under section 6015(c).

As of the time of trial, petitioner had not initiated any divorce action.

OPINION

I. *Jurisdiction*

Our jurisdiction in this case is derived from section 6213(a), respondent's having issued a notice of deficiency to petitioner and petitioner's having timely petitioned this Court for a redetermination of the deficiency. We have jurisdiction over petitioner's section 6015 claims as part of that deficiency jurisdiction. *See Butler v. Commissioner*, 114 T.C. 276, 287–88 (2000).

II. *Deficiency*

We first consider whether petitioner is liable for the deficiency and the penalty respondent determined.

**[\*7]**   A.   *Burden of Proof and Production*

In general, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of demonstrating error in those determinations. *See* Rule 142(a)(1); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). The burden on factual issues that affect a taxpayer's liability for tax may shift to the Commissioner if "a taxpayer introduces credible evidence with respect to . . . such issue." § 7491(a)(1); *see Higbee v. Commissioner*, 116 T.C. 438, 442 (2001) ("Credible evidence is the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness)." (quoting H.R. Rep. No. 105-599, at 240–41 (1998), *reprinted in* 1998-3 C.B. 747, 994–95)).[7] Additionally, "if a taxpayer asserts a reasonable dispute with respect to any item of income reported on an information return filed . . . by a third party and the taxpayer has fully cooperated with the Secretary . . . , the Secretary shall have the burden of producing reasonable and probative information concerning such deficiency in addition to such information return." § 6201(d).

B.   *IRA Distributions*

Section 61(a) provides that "gross income means all income from whatever source derived." Section 408(d)(1) provides that any amount paid or distributed out of an IRA is included in the gross income of the payee or distributee in the manner provided under section 72. The general rule of section 408(d)(1) does not apply to a rollover contribution, transfers incident to divorce, or distributions for charitable purposes. *See* § 408(d)(3), (6), (8). A rollover contribution is any amount paid or distributed out of an IRA to the individual for whose benefit the account or annuity is maintained if the entire amount received is paid into an eligible retirement plan no later than 60 days after receipt. § 408(d)(3)(A)(ii); *see Schoof v. Commissioner*, 110 T.C. 1, 7 (1998).

Generally, the payee or distributee of an IRA is the participant or beneficiary who is eligible to receive funds from the IRA. *Roberts v. Commissioner*, 141 T.C. 569, 576 (2013); *see also Darby v. Commissioner*, 97 T.C. 51, 58 (1991). Neither the Code nor applicable regulations define

---

[7] In addition a taxpayer is entitled to this shift in the burden of proof only if he has complied with certain substantiation requirements, maintained required records, and cooperated with reasonable requests for witnesses, information, or documents. § 7491(a)(2).

[*8] the terms "payee" or "distributee" or provide specific guidance regarding when an amount is considered to have been paid or distributed to a payee or distributee under section 408(d)(1). *Roberts*, 141 T.C. at 577.

Petitioner argues that pursuant to section 6201(d), respondent "bears the burden of proof" with respect to the taxability of the Morgan Stanley IRA distributions. Petitioner contends she has asserted a reasonable dispute by virtue of the fact that (1) box 2b, "Taxable amount not determined," is checked on the Form 1099–R; (2) the records for only $80,000 of wire transfers from the IRA designate the transferred amounts as taxable and only one such wire transfer record (for $10,000) bears a manager's signature with a date; and (3) the records for the remaining $42,500 of transfers contain no indication that they were taxable and accordingly, since the IRA from which Mr. Cotroneo was receiving the distribution was a rollover IRA, he must have rolled over these distributions as well because he had done so in the past. In petitioner's view the foregoing constitute errors or irregularities that cast doubt on the Morgan Stanley records' designation of the distributed amounts as taxable.

Petitioner's first point does not raise any reasonable dispute. Several of Mr. Cotroneo's withdrawal request forms in the Morgan Stanley records indicate that the account from which the distributions to him were made was a traditional IRA. The 2012 Instructions for Forms 1099–R and 5498, at 9 (2012), instruct payers as follows with respect to completing Form 1099–R covering a traditional IRA:

> Generally, you [the payer] are not required to compute the taxable amount of a traditional . . . IRA nor designate whether any part of a distribution is a return of basis attributable to nondeductible contributions. Therefore, . . . report the total amount distributed from a traditional . . . IRA in box 2a [i.e., "Taxable amount"]. This will be the same amount reported in box 1 [i.e., "Gross distribution"]. Check the "Taxable amount not determined" box in box 2b.

Contrary to petitioner's suggestion that the check in box 2b denotes that distributions to Mr. Cotroneo from his Morgan Stanley IRA were something other than fully taxable, the Form 1099–R instructions make clear that box 2b is to be checked when a fully taxable distribution is made from a traditional IRA. As filled out, the Form 1099–R issued to Mr. Cotroneo from Morgan Stanley reflects Morgan Stanley's position

[*9] that the account in question was a traditional IRA and that the entire $122,500 distribution from it was taxable.

As for petitioner's second point, the Morgan Stanley records include IRA withdrawal requests signed by Mr. Cotroneo where he gives his birth year as 1950, indicating that he was older than 59-1/2 when he sought the withdrawals. (Several of the withdrawal requests also note that they are "normal" distributions (i.e., the distributee has attained age 59-1/2).) The only evidence in the record concerning any Morgan Stanley policy requiring a manager's signature appears on one of Mr. Cotroneo's withdrawal requests. That particular withdrawal request contains a section for a manager's signature wherein it is noted that such a signature is "[r]equired for 72(t) distributions only." Section 72(t) imposes an additional 10% tax on a distribution from an IRA except where the distributee is 59-1/2 (and in certain other circumstances not relevant here). *See* § 72(t)(2)(A)(i).

Thus, given Mr. Cotroneo's representation regarding his age, the available evidence concerning Morgan Stanley's policies suggests that no manager's signature was necessary concerning the $122,500 in distributions reflected in the Morgan Stanley records. Accordingly, contrary to petitioner's suggestion, the absence of a manager's signature on the withdrawal documents in the Morgan Stanley records does not suggest that those documents contain "errors" that would cast doubt on their designation of the distributions as taxable.

Petitioner's third point is that, since the records of the remaining $42,500 in transfers out of Mr. Cotroneo's IRA do not on their face designate the transferred amounts as taxable, Mr. Cotroneo must have rolled over these amounts into an IRA or an eligible retirement plan account. *See* § 408(d)(3). Petitioner suggests that since Mr. Cotroneo's Morgan Stanley IRA from which the distributions were made was itself a rollover account, he must have effected rollovers with respect to the distributions that were not denominated as taxable in the Morgan Stanley records. However, the fact that Mr. Cotroneo had effected an IRA rollover in the past is not persuasive evidence that he rolled over any of the amounts distributed to him in 2012. There is no other evidence in the record that Mr. Cotroneo effected any rollovers with respect to the distributed amounts in 2012, and petitioner's speculation on this point does not raise a reasonable dispute with respect to the taxability of the IRA distributions within the meaning of section 6201(d).

[*10] Even if the foregoing points of petitioner's were treated as raising a reasonable dispute, the consequence under section 6201(d) is not, as petitioner contends, a shift in the burden of proof to respondent. Instead, section 6201(d) would impose upon respondent only "the burden of producing reasonable and probative information concerning [the] deficiency in addition to [the] information return." Respondent has done so. The contemporaneously maintained business records of Morgan Stanley, the authenticity of which the parties have stipulated and to which petitioner has not made any hearsay objection, show that the account from which $122,500 in distributions was made to Mr. Cotroneo during 2012 was a traditional IRA. This is reasonable and probative information concerning the deficiency respondent determined on the basis that Mr. Cotroneo received taxable IRA distributions of $122,500 for 2012 that were not reported. Thus respondent has satisfied his burden of production under section 6201(d) and the burden of proof remains on petitioner to demonstrate error in the deficiency determination with respect to the unreported IRA distributions.

Petitioner also argues that the burden of proof has shifted to respondent pursuant to section 7491(a) concerning all factual issues underlying his deficiency determinations, including the determination premised on the unreported IRA distributions. Petitioner contends that she has introduced credible evidence as contemplated in section 7491(a) sufficient to shift the burden on this issue. She relies on the same points just discussed concerning the checked box 2b on the Form 1099–R issued to Mr. Cotroneo, and the failure of some of the withdrawal forms in the Morgan Stanley records to designate the distributed amounts as taxable or to contain a manager's signature. For the same reasons outlined in our discussion of section 6201(d), we conclude that petitioner has not introduced credible evidence for purposes of section 7491(a)—that is, evidence "which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted." *See Higbee*, 116 T.C. at 442. At best, petitioner has offered the speculation that, because the IRA from which Mr. Cotroneo made the withdrawals in 2012 was itself a rollover account, he must have rolled over the amounts withdrawn from that account.

Nevertheless, the allocation of the burden of proof would have no impact on our holding regarding the unreported IRA distributions issue. The evidence on this issue is not in equipoise. *See Blodgett v. Commissioner*, 394 F.3d 1030, 1039 (8th Cir. 2005), *aff'g* T.C. Memo. 2003-212; *Dagres v. Commissioner*, 136 T.C. 263, 279 (2011). We instead hold, on the preponderance of the evidence—including in particular the

**[\*11]** comprehensive Morgan Stanley records that document Mr. Cotroneo's withdrawal of $122,500 from a traditional IRA during 2012—that respondent's determination that petitioner failed to report $122,500 in taxable IRA distributions is sustained.

### C.  *Partnership Income*

Petitioner has not addressed respondent's determination that the Cotroneos failed to report $144 of partnership income for 2012. Petitioner has therefore conceded this issue.  *See Mendes v. Commissioner*, 121 T.C. 308, 312–13 (2003); *Leahy v. Commissioner*, 87 T.C. 56, 73–74 (1986).

### D.  *Social Security Income*

In the case of Social Security benefits the amount included in gross income, if any, is determined in accordance with the formula set forth in section 86.  Under that formula, a portion of the benefits is includible in gross income if the sum of the taxpayer's modified adjusted gross income (MAGI), as defined by section 86(b)(2), plus one-half of the amount of Social Security benefits received, exceeds certain threshold amounts, the "base amount" and the "adjusted base amount."  *See* § 86(a) and (b)(1).  In petitioner's case, these threshold amounts are $32,000 and $44,000, respectively.  *See* § 86(c)(1)(B), (2)(B).  Although section 86 refers to a "taxpayer," a joint return "is treated as the return of a taxable unit and the net income disclosed by the return is subject to [tax] * * * as though the return were that of a single individual."  *See Boehm v. Commissioner*, T.C. Memo. 1999-227, 1999 WL 498494, at \*4 (alterations in original) (quoting *Helvering v. Janney*, 311 U.S. 189, 192 (1940)).

The parties do not dispute that petitioner and Mr. Cotroneo received $8,220 of Social Security benefits in 2012.  Therefore, section 6201(d) does not apply.  However, the parties disagree on what portion of the amount received is taxable under a section 86 calculation.  Given that we have sustained respondent's determinations that the Cotroneos failed to include in gross income $122,500 of IRA distributions and $144 of partnership income, the Cotroneos' MAGI includes these amounts, totaling $122,644.  After adding that total to the other income items reported on their return and adjusting for deductions claimed therein or otherwise allowed by the notice of deficiency, the Cotroneos' MAGI is $147,514.  The sum of one-half of the Cotroneos' Social Security benefits,

[*12] $4,110, plus their MAGI, $147,514, equals $151,624. This amount exceeds the "adjusted base amount," $44,000, by $107,624.

Accordingly, the portion of the Cotroneos' Social Security benefits includible in income is determined as provided in section 86(a)(2). That provision requires petitioner to include in gross income the lesser of (A) or (B), computed as follows: (A) the sum of (i) 85% of the above excess, $91,480, plus (ii) the lesser of the amount determined under section 86(a)(1), $4,110, or one-half of the difference between the adjusted base amount and the base amount, $6,000; or (B) 85% of the Social Security benefits received during the taxable year, $6,987. *See* § 86(a)(2). Pursuant to this formula, $6,987 of the Cotroneos' Social Security benefits is includible in their gross income for 2012. We therefore sustain respondent's determination that petitioner failed to report $6,987 of taxable Social Security benefits for 2012.

E.    *Substantial Understatement Penalty*

Section 6662(a) and (b)(2) imposes a 20% accuracy-related penalty on any underpayment of tax attributable to a substantial understatement of income tax. An understatement is generally defined as the excess of the amount required to be shown on the return over the amount shown on the return. § 6662(d)(2)(A). A substantial understatement of tax exists if the amount of the understatement for the taxable year exceeds the greater of (1) 10% of the tax required to be shown on the return or (2) $5,000. § 6662(d)(1)(A).

Petitioner does not dispute that the understatement of tax on the 2012 return exceeds the greater of 10% of the tax required to be shown on the return or $5,000. *See* § 6662(d)(1)(A). Instead, petitioner argues that respondent has not demonstrated that supervisory approval of the penalty was obtained as required by section 6751(b)(1) and that she had reasonable cause because she relied on the advice of the 2012 return's preparer, Mr. Hauspurg. We first consider petitioner's section 6751(b) argument.

The Commissioner bears the burden of production with regard to accuracy-related penalties and must come forward with sufficient evidence indicating that it is appropriate to impose them. *See* § 7491(c); *see also Higbee*, 116 T.C. at 446. Once the Commissioner meets his burden of production, the taxpayer bears the burden of proving that the Commissioner's penalty determination is incorrect. *See Higbee*, 116 T.C. at 446–47. Section 6751(b)(1) provides that no penalty may be assessed

[*13] when the initial determination to assess it is not approved in writing by the immediate supervisor of the person making the initial determination. Demonstrating compliance with section 6751(b)(1) "is properly a part of [the Commissioner's] burden of production under section 7491(c)." *Graev v. Commissioner*, 149 T.C. 485, 493 (2017), *supplementing and overruling in part* 147 T.C. 460 (2016).

Under section 6751(b)(2)(B), supervisory approval is not required for a substantial understatement penalty that is automatically calculated without human review through the AUR program. *See Walquist v. Commissioner*, 152 T.C. 61, 73–74 (2019) (holding that no supervisory approval was required for a substantial understatement penalty determined without human intervention through the Correspondence Examination Automated Support program); *Ball v. Commissioner*, T.C. Memo. 2020-152, at *12–13 (reaching same conclusion where the AUR program automatically calculated a substantial understatement penalty). The IRS concedes that human review and supervisory approval of a penalty determination are required where a taxpayer has responded to a computer-generated notice proposing a penalty. *Internal Revenue Manual* (IRM) 20.1.1.2.3.2 (Nov. 25, 2011), 20.1.5.1.6(9) (Jan. 24, 2012); *see also Walquist*, 152 T.C. at 70–71 & n.7; *Ayria v. Commissioner*, T.C. Memo. 2022-123, at *10–11 & n.3 (describing scenario involving supervisory approval where taxpayer responded to initial communication of an automatically calculated penalty).

In response to petitioner's contention that respondent has failed to meet his burden of production, given the absence of any proof of the written supervisory approval required by section 6751(b)(1), respondent maintains that no supervisory approval was required because the substantial understatement penalty was automatically calculated through electronic means within the meaning of section 6751(b)(2). Since demonstrating compliance with section 6751(b)(1) is part of respondent's burden of production, it follows that his burden of production here includes demonstrating, in accordance with the IRS position announced in the IRM, that petitioner did not communicate with any AUR personnel with respect to the penalty. Had she done so, the AUR personnel would have been required, pursuant to the procedures outlined in the IRM, to make an independent determination regarding the appropriateness of the penalty and supervisory approval would likewise have been required. As explained below, in view of correspondence in the record between petitioner and an AUR operations manager concerning her 2012 taxable year, we are unable to conclude

**[\*14]** on this record that respondent has satisfied his burden of production to show that supervisory approval was not required for the penalty at issue.

A Notice CP2000 was sent from the AUR program to petitioner (and Mr. Cotroneo) concerning their 2012 taxable year on July 21, 2014. The Notice CP2000 proposed a tax deficiency and a penalty for an underpayment due to a substantial understatement of income tax. Respondent asserts that petitioner did not respond to the Notice CP2000, and there is no evidence in the record that petitioner or Mr. Cotroneo responded to the Notice CP2000 after it was issued and before the notice of deficiency was issued. The notice of deficiency originated from the AUR program[8] and determined a tax deficiency and substantial understatement penalty in the same amounts as had been proposed in the Notice CP2000.

On the basis of the foregoing, respondent argues that the substantial understatement penalty was automatically calculated by the AUR program because there was no response to the Notice CP2000. We disagree because, while there is no evidence that the Cotroneos responded to the Notice CP2000 specifically, the record does demonstrate that there was correspondence between petitioner and AUR personnel concerning the 2012 taxable year that *preceded* the Notice CP2000. The record contains a September 1, 2014, letter from an AUR operations manager to the Cotroneos, which states as its subject their 2012 taxable year. The letter begins: "Thank you for your response of July 7, 2014." While the record does not contain the July 7 response that the Cotroneos made, the reference to it persuades us that petitioner[9] corresponded in writing with AUR personnel on or about July 7, 2014, concerning her 2012 taxable year. Moreover, we draw the further inference that petitioner received correspondence from the AUR program sometime before July 7, 2014. Otherwise, what could have prompted her to write to AUR personnel on or about July 7, 2014? Consequently, we find that petitioner and AUR personnel communicated with respect to the 2012 taxable year before the Notice CP2000 was issued.

Respondent has the burden of production, and he has not produced either petitioner's July 7, 2014, correspondence with AUR

---

[8] Our finding in this respect is based upon the fact that the notice of deficiency bears an AUR control number.

[9] In July 2014 Mr. Cotroneo was incarcerated.

**[\*15]** personnel or the AUR notice or letter that prompted it. In these circumstances we are unable to rule out that the substantial understatement penalty was addressed in these communications.[10] The existence of these communications casts doubt on a finding that the substantial understatement penalty was automatically calculated without any independent determination by AUR personnel. Consequently, respondent has not shown that no independent determination was made by AUR personnel concerning the penalty and thus that no supervisory approval was required.

Having failed to produce evidence of written supervisory approval of the penalty or to show that the penalty was automatically calculated within the meaning of section 6751(b)(2)(B), respondent has failed to meet his burden of production under section 7491(c).[11] Accordingly, the penalty determination is not sustained.

III.  *Section 6015 Relief*

We next consider whether petitioner is entitled to relief from liability for the deficiency pursuant to section 6015.

A.  *Overview*

Generally, married taxpayers may elect to file a joint federal income tax return. § 6013(a). If a joint return is made, the tax is computed on the spouses' aggregate income, and each spouse is fully responsible for the accuracy of the return and is jointly and severally liable for the entire amount of tax shown on the return or found to be owing. § 6013(d)(3); *Butler*, 114 T.C. at 282. Nevertheless, under certain circumstances, a spouse who has made a joint return may seek relief from joint and several liability under procedures set forth in section 6015. § 6015(a). Section 6015 provides a spouse with three alternative grounds for relief: (1) full or partial relief under subsection (b), (2) proportionate relief under subsection (c), and (3) if relief is not available under subsection (b) or (c), equitable relief under subsection (f).

---

[10] We note in this regard that petitioner testified that she relied on the Cotroneos' accountant, Mr. Hauspurg, who prepared the 2012 return, for its accuracy. One could reasonably infer that she offered this explanation in any earlier communication with AUR personnel.

[11] In view of our holding regarding the burden of production, we need not address petitioner's reasonable cause defense.

**[\*16]** In cases involving requests for innocent spouse relief, the spouse requesting relief generally bears the burden of proof. Rule 142(a); *Alt v. Commissioner*, 119 T.C. 306, 311 (2002), *aff'd*, 101 F. App'x 34 (6th Cir. 2004). An exception is found in section 6015(c), which places upon the Commissioner the burden of proving that a spouse electing relief under subsection (c) either had actual knowledge at the time of signing the return of any item giving rise to the deficiency or was part of a fraudulent scheme to transfer assets. § 6015(c)(3)(A)(ii), (C) (providing that where the Commissioner meets this burden, the taxpayer is ineligible for relief under section 6015(c)). Actual knowledge for this purpose is established by a preponderance of the evidence. *Culver v. Commissioner*, 116 T.C. 189, 196 (2001); *Knight v. Commissioner*, T.C. Memo. 2010-242; *McDaniel v. Commissioner*, T.C. Memo. 2009-137. The standard and scope of review in determining whether relief is warranted under subsection (b), (c), or (f) of section 6015 is de novo. *Porter v. Commissioner*, 132 T.C. 203, 210 (2009).[12]

B.     *Section 6015(b)*

Pursuant to section 6015(b)(1), the following requirements must be satisfied for relief from joint and several liability under section 6015(b): (A) the spouses filed a joint return for the taxable year; (B) the understatement of tax is attributable to an erroneous item of the nonrequesting spouse; (C) the requesting spouse establishes that in signing the return he or she did not know, and had no reason to know, of the understatement; (D) after taking into account all of the facts and circumstances, it is inequitable to hold the requesting spouse liable for the deficiency attributable to the understatement; and (E) the requesting spouse timely elects the benefits of subsection (b). These five requirements are stated in the conjunctive, and thus a failure to meet even one of them prevents a requesting spouse from qualifying for relief. *Alt*, 119 T.C. at 313.

Neither party disputes that the requirements of subparagraphs (A) and (E) of section 6015(b)(1) have been satisfied. Respondent disputes whether the requirements of subparagraphs (B), (C), and (D) of section 6015(b)(1) have been met. We shall first address the reason to know requirement of section 6015(b)(1)(C).

---

[12] As the Petition was filed before section 6015(e)(7) became effective, it has no application here. *See Sutherland v. Commissioner*, 155 T.C. 95, 104 (2020).

**[\*17]** A requesting spouse has reason to know of an understatement if a reasonable person in circumstances similar to those of the taxpayer could be expected to know of an erroneous or missing item at the time of signing the return. Treas. Reg. § 1.6015-2(c); *see, e.g., Reilly-Casey v. Commissioner*, T.C. Memo. 2013-292. The applicable regulations provide that the facts and circumstances used to determine whether a spouse had reason to know of an understatement include, among other things, whether the requesting spouse failed to inquire, when or before signing the return, about items on the return or omitted from the return that a reasonable person would question. Treas. Reg. § 1.6015-2(c); *see Canty v. Commissioner*, T.C. Memo. 2016-169. Put another way, the spouse seeking relief has a "duty of inquiry." *Stevens v. Commissioner*, 872 F.2d 1499, 1505 (11th Cir. 1989), *aff'g* T.C. Memo. 1988-63; *Shea v. Commissioner*, 780 F.2d 561, 566 (6th Cir. 1986), *aff'g in part, rev'g in part* T.C. Memo. 1984-310; *Butler*, 114 T.C. at 284. Section 6015 does not protect a spouse who turns a blind eye to facts readily available to him or her. *Porter*, 132 T.C. at 212; *see also Greer v. Commissioner*, 595 F.3d 338, 351 (6th Cir. 2010), *aff'g* T.C. Memo 2009-20.

The facts and circumstances in this case strongly indicate that petitioner had reason to know of the understatement of tax on the 2012 return, as we believe a reasonable person in similar circumstances would have reason to know of, or a duty of inquiry with respect to, substantial omissions of income from the return. During 2012 petitioner wrote approximately $100,000 in checks to cover the family's living expenses. Petitioner earned wages of only $2,133 during the year, and the Cotroneos received Social Security income of $8,220. Petitioner was aware that Mr. Cotroneo made deposits into her checking account that enabled her to write the foregoing checks. And yet the 2012 return reported total income of only $34,633. In such circumstances petitioner had a duty to inquire as to how Mr. Cotroneo was able to cover approximately $100,000 of her spending during the year if their total income as reported in the 2012 return was only $34,633. Such a duty would extend to exploring whether Mr. Cotroneo had a nontaxable source of income for the deposits she was aware he made into her checking account.

Furthermore, petitioner had a heightened duty to inquire in this instance. The 2012 return was prepared by Mr. Hauspurg using solely the input of Mr. Cotroneo, who had recently entered a guilty plea for tax evasion and bribery. Despite this, petitioner signed the 2012 return without reviewing it. A reasonable person in these circumstances would not do so.

**[\*18]** We find that petitioner had a duty to inquire about the omitted income before signing the return. Her failure to inquire results in her having reason to know of the understatement arising from the omission of the IRA distribution and partnership income. Her failure to satisfy the "reason to know" requirements of section 6015(b)(1)(C) is fatal to her claim for relief under section 6015(b).[13]

### C. *Section 6015(c)*

Petitioner did not raise relief under section 6015(c) in the Petition, which was prepared by counsel. Instead, she first raised the issue in her Pretrial Memorandum submitted just before trial.[14]

Section 6015(c) allows a requesting spouse to elect to be liable only for that portion of a joint return deficiency that is properly allocable to him or her under the rules of section 6015(d). The election is available only to a spouse who (1) at the time the election is filed, is no longer married to the nonrequesting spouse or is legally separated, or (2) has not been a member of the same household as the nonrequesting spouse at any time during the 12-month period ending on the date the election is filed. § 6015(c)(3)(A)(i).

---

[13] As a consequence, we need not consider whether petitioner satisfied the requirements of section 6015(b)(1)(B) or (D). We also conclude, *see infra* pp. 19–22, that assets were transferred between Mr. Cotroneo and petitioner as part of a fraudulent scheme within the meaning of Treasury Regulation § 1.6015-1(d). This conclusion is an independent basis precluding relief under section 6015(b) as well. *See Chen v. Commissioner*, T.C. Memo. 2006-160, 2006 WL 2270402; Treas. Reg. § 1.6015-1(d).

[14] On brief respondent contends that petitioner raised the issue of relief under section 6015(c) for the first time on brief and that as a result respondent would be unfairly prejudiced if we were to consider the issue, given that respondent was unable to adduce evidence at trial with respect to it. We disagree. First, respondent is mistaken regarding when petitioner first raised the issue. Petitioner claimed entitlement to relief under section 6015(c) in her Pretrial Memorandum, and respondent, in a Supplemental Pretrial Memorandum, responded to the claim by taking the position that petitioner was not eligible to elect section 6015(c) relief by virtue of her failure to satisfy section 6015(c)(3)(A)(i). Moreover, respondent's counsel questioned petitioner at trial concerning whether she was divorced or legally separated from Mr. Cotroneo—questions which bore directly on the grounds on which respondent contended in his Supplemental Pretrial Memorandum that petitioner was ineligible to elect section 6015(c) relief. Given the foregoing, we are satisfied that respondent had notice before trial that petitioner was making a section 6015(c) claim and that the issue of her entitlement to section 6015(c) relief was tried by consent. *See* Rule 41(b).

[*19] However, the statute further provides that certain taxpayers are ineligible to make the election under section 6015(c) to limit their liability to the portion of the deficiency allocable to them. Section 6015(c)(3)(A)(ii) provides:

> (ii) Certain taxpayers ineligible to elect.—If the Secretary demonstrates that assets were transferred between individuals filing a joint return as part of a fraudulent scheme by such individuals, an election under this subsection [(c)] by either individual shall be invalid (and section 6013(d)(3) [imposing joint and several liability on each filer of a joint return] shall apply to the joint return).

The regulations define fraudulent scheme for this purpose as follows: "[A] fraudulent scheme includes a scheme to defraud the [IRS] or another third party, including, but not limited to, creditors, ex-spouses, and business partners." Treas. Reg. § 1.6015-1(d).

For the reasons discussed below, we hold that Mr. Cotroneo and petitioner transferred assets as part of a fraudulent scheme within the meaning of section 6015(c)(3)(A)(ii) and Treasury Regulation § 1.6015-1(d).

### 1. *Fraudulent Scheme*

In his Answering Brief respondent argued that the sale of the Bernardsville residence followed by the purchase of the Chester residence solely in petitioner's name using funds provided by Mr. Cotroneo was a "questionable transfer of a joint marital asset . . . to thwart potential collection actions by the government and to render . . . [Mr. Cotroneo] judgment and collection proof," concluding that the transfer was a "fraudulent transfer scheme." In response, we sought supplemental briefing addressing the issue of whether assets were transferred between the Cotroneos as part of a fraudulent scheme within the meaning of section 6015(c)(3)(A)(ii) and Treasury Regulation § 1.6015-1(d) (defining a fraudulent scheme for this purpose).

On the record before us, we find that respondent has carried his burden of establishing that the purchase of the Chester residence was

**[\*20]** done as part of a fraudulent scheme to transfer assets from Mr. Cotroneo to petitioner.[15]

Mr. Cotroneo entered a guilty plea to tax evasion and bribery on October 18, 2010. In his plea agreement, signed July 28, 2010, Mr. Cotroneo agreed to (1) forfeit all property, real and personal, derived from his bribery scheme and (2) file amended tax returns for 2005 through 2007 and pay any resulting tax owed to the IRS. While the record does not disclose the amount of the additional tax owed for 2005 through 2007, the charging indictment alleged a tax deficiency exceeding $570,000 resulting from unreported income exceeding $1,500,000. The magnitude of the proceeds from the bribery scheme, of which Mr. Cotroneo was undoubtedly aware, was reflected in his later sentence, which required that he forfeit over $9 million. Therefore, we find that as of July 28, 2010, Mr. Cotroneo was aware of the likelihood that he would have liabilities in the range of millions of dollars. Petitioner was likewise aware of these likely liabilities, though not the precise amount of them.

Less than four months after Mr. Cotroneo's plea, on February 10, 2011, the Cotroneos sold the jointly owned Bernardsville residence for $3,300,000 and received $151,000 in net proceeds from the sale. That same day the Chester residence was purchased for $950,000 in cash and titled solely in petitioner's name. Petitioner testified at trial that her mother provided $110,000 of the purchase price and that she did not

---

[15] Petitioner contends that respondent must demonstrate by clear and convincing evidence (not merely a preponderance of the evidence) that Mr. Cotroneo and petitioner transferred assets as part of a fraudulent scheme, citing Rule 142(b). Rule 142(b) requires respondent to carry his burden of proof "[i]n any case involving the issue of fraud with intent to evade tax" by clear and convincing evidence. We note that section 6015(c)(3)(A)(ii) provides merely "[i]f the Secretary demonstrates" without any reference to his needing to do so "by clear and convincing evidence." The same phrase—"[i]f the Secretary demonstrates"—is found elsewhere in section 6015(c)(3); namely, in section 6015(c)(3)(C). With respect to that phrase, we have held that it requires proof merely by a preponderance of the evidence. *See Culver*, 116 T.C. at 195–96. Moreover, the imposition of the clear and convincing standard in Rule 142(b) covers fraud "with intent to evade tax" whereas the "fraudulent scheme" contemplated by section 6015(c)(3)(A)(ii) extends to "a scheme to defraud the [IRS] or another third party, including, but not limited to, creditors, ex-spouses, and business partners." Treas. Reg. § 1.6015-1(d). Nevertheless, we need not decide whether the "preponderance of the evidence" or "clear and convincing evidence" standard governs, because we conclude that respondent prevails here under either standard, having shown by clear and convincing evidence that assets were transferred between Mr. Cotroneo and petitioner as part of a fraudulent scheme within the meaning of section 6015(c)(3)(A)(ii) and Treasury Regulation § 1.6015(d)(1).

[*21] know the source of the $840,000 balance. Given the magnitude of the sum, petitioner's self-serving professed ignorance of its source—to the extent she would have us believe it did not come from Mr. Cotroneo—is not credible, and we do not credit it. *See Tokarski v. Commissioner*, 87 T.C. 74, 77 (1986).

Instead, the evidence clearly and convincingly supports a finding that the $840,000 cash balance used to purchase the Chester residence came from the following sources: $151,000 from the net proceeds the Cotroneos received from the sale of the Bernardsville residence (which they jointly owned) and the remaining $689,000 solely from Mr. Cotroneo. The finding is based on the following: (1) Thomas E. Dooley represented the Cotroneos in their sale of the Bernardsville residence and the purchase of the Chester residence, (2) Mr. Cotroneo withdrew $304,000 from his Morgan Stanley IRA eight days before the purchase (February 2, 2011) that was remitted to the Thomas E. Dooley Trust, (3) Mr. Cotroneo was present at the closing on the Chester residence, and (4) the Chester residence was purchased unencumbered. Even without these identified funding sources Mr. Cotroneo obtained proximate to the Chester residence purchase, there is simply no other conceivable source of the funds for the Chester residence purchase than Mr. Cotroneo[16] (with the exception of the portion petitioner claims her mother supplied—a contention we accept for this purpose).

At trial petitioner admitted that she insisted that the Chester residence be titled solely in her name as a way to prevent Mr. Cotroneo's obligations from attaching to the residence. She could not have been unaware of the source of the bulk of the funds used to purchase the residence. Petitioner's admission concerning her goal in titling the residence in her name clearly and convincingly demonstrates that at the time of the Chester residence's purchase the Cotroneos had the requisite intent to defraud necessary to find that they engaged in a fraudulent scheme. Simply put, the Cotroneos arranged for Mr. Cotroneo's share of the Bernardsville residence sale proceeds and substantial funds from his IRA as well as other of his sources to be used to purchase real property titled in petitioner's name, in an attempt to make these funds unavailable to satisfy the impending claims of Mr. Cotroneo's creditors, including the IRS. This puts the arrangements squarely within the terms proscribed by Treasury Regulation § 1.6015-1(d) and is fatal to her claim for relief under section 6015(c). *See Durland v. Commissioner*,

---

[16] Petitioner was working as a homemaker from 1990 to 2012 and was earning no income.

**[\*22]** T.C. Memo. 2016-133 (finding fraudulent transfer of assets where house purchased with husband's assets was titled in wife's name to put those assets beyond reach of his creditors).

### 2. *Petitioner's Equitable Interest Defense*

Against the conclusion that she engaged in a fraudulent transfer within the meaning of Treasury Regulation § 1.6015-1(d), petitioner argues, citing N.J. Stat. Ann. § 2A:34-23(h) (West 2018),[17] that she had a substantial equitable interest in the couple's marital property and that any transfer to her would have to exceed her "actual and equitable interest" in the couple's marital property before it could be a fraud on Mr. Cotroneo's creditors. We disagree for several reasons. First and foremost, whatever equitable interest petitioner might have had in Mr. Cotroneo's IRA or the proceeds from the Bernardsville residence would almost certainly have to be resolved judicially. What petitioner and Mr. Cotroneo attempted to do was an end run around any lawful process to decide her equitable ownership as against Mr. Cotroneo's creditors.

Second, any equitable distribution of their marital property would occur only incident to their divorce. Petitioner and Mr. Cotroneo remained married at the time of trial and during the period of the briefing schedule. Absent divorce, petitioner simply had no equitable interest in the couple's marital property. *See Carr v. Carr*, 576 A.2d 872, 875 (N.J. 1990) ("By the plain terms of the statute, a spouse's right to share in marital property by virtue of equitable distribution arises when 'a judgment of divorce . . . is entered.'" (quoting N.J. Stat. Ann. § 2A:34-23)). In *Carr* the New Jersey Supreme Court held that a wife could not maintain an equitable distribution claim against the estate of her estranged husband who died while the divorce action was pending, because no judgment of divorce had been entered.

Third, even putting aside petitioner's marital status, only property that was "legally and beneficially acquired by" the couple

---

[17] The statutory authority for New Jersey's equitable distribution process is found in N.J. Stat. Ann. § 2A:34-23(h), which provides:

> [I]n all actions where a judgment of divorce . . . is entered the court may make such award or awards to the parties . . . to effectuate an equitable distribution of the property, both real and personal, which was legally and beneficially acquired by them or either of them during the marriage . . . .

**[\*23]** during marriage is subject to equitable distribution. In New Jersey equitable division is barred for property obtained with illicit or illegal funds. *Sheridan v. Sheridan,* 589 A.2d 1067, 1071 (N.J. Super. Ct. Ch. Div. 1990). "[A] fair and common sense interpretation of the statutory purpose in permitting the division of 'legally and beneficially acquired' property bars the equitable division of property obtained with illicit or illegal funds." *Id.* at 1071 (quoting N.J. Stat. Ann. § 2A:34-23). The record in this case establishes that Mr. Cotroneo's bribery schemes netted him millions of dollars of illicit funds. We have found that the bulk of the purchase price for the Chester residence came from Mr. Cotroneo. Accordingly, there is a clear basis to conclude that the Chester residence was acquired with illicit funds.[18]

For the foregoing reasons we are not persuaded that petitioner had an equitable interest in the Chester residence under New Jersey law. Accordingly, our conclusion that petitioner is not entitled to relief under section 6015(c) by virtue of Treasury Regulation § 1.6015-1(d) stands.

D. *Section 6015(f)*

Under section 6015(f), the Secretary may relieve an individual of liability for a deficiency if, taking into account all the facts and circumstances, it is inequitable to hold the individual liable and relief is not available under section 6015(b) or (c).

Our conclusion that petitioner engaged in a transfer of assets with Mr. Cotroneo as part of a fraudulent scheme to defraud creditors precludes any relief under section 6015(f). Treasury Regulation § 1.6015-1(d) provides: "If the Secretary establishes that a spouse transferred assets to the other spouse as part of a fraudulent scheme, *relief is not available under section 6015 . . . .*" (Emphasis added.) Thus, the regulation forecloses any section 6015 relief, whether it is sought under subsection (b), (c), or (f). *See Chen v. Commissioner,* 2006 WL

---

[18] We further note in this regard that Mr. Cotroneo's indictment for tax evasion alleged that a portion of the income Mr. Cotroneo failed to report for 2005 through 2007 consisted of $571,000 in landscaping and remodeling costs for the Bernardsville residence that had been paid to him by a sham corporation and were bribery proceeds. Mr. Cotroneo ultimately pleaded guilty to one count of bribery and one count of tax evasion for 2007 and agreed to forfeit all real property that was derived from proceeds traceable to the commission of the bribery offense. The $571,000 in landscaping and remodeling expenditures undoubtedly increased the Bernardsville residence's value, and $151,000 of the proceeds from its sale were used to purchase the Chester residence.

**[\*24]** 2270402, at \*4 ("We hold that [Treasury Regulation § 1.6015-1(d)] alone supports the Commissioner's refusal to grant [the taxpayer] innocent spouse relief under any subsection of section 6015 . . . .").

We have considered the parties' remaining arguments and, to the extent not discussed, conclude that those arguments are irrelevant, moot, or without merit.

To reflect the foregoing,

*Decision will be entered for respondent as to the deficiency and for petitioner as to the accuracy-related penalty under section 6662(a).*