**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0501-24

JON MUSCO,

      Plaintiff,

v.

SMGR HOLDINGS LLC, 107
LONERGAN HOLDINGS LLC,
EAST JERSEY PROPERTIES
LLC, LOAN FUNDER LLC,
SERIES 23697, and MEISTER
ABSTRACT CORP.,

      Defendants/Third-Party
      Plaintiffs-Respondents,

v.

MAHIR ALLAN, WOODROW
HOLDINGS LLC, and MJS
PORTFOLIO I, LLC,

      Third-Party Defendants/
      Fourth-Party Plaintiffs-
      Appellants,

v.

SARA BLUMENBERG, ASHER

BLUMENBERG, ISRAEL
BLUMENBERG, SHLOIME
GREEN, SCHMUEL MAYER
ROTH, GREENLIGHT
PROPERTIES, LLC, ISAAC
HERNANDEZ, NATHAN KATZ,
AARON BIEGELSISEN,
and SAMUEL ROTH,

     Fourth-Party Defendants-
     Respondents.

_____

U.S. BANK TRUST NATIONAL
ASSOCIATION, not in its individual
capacity but solely as Trustee of
Fidelity & Guaranty Life Mortgage
Trust 2018-1,

     Intervenor.

_____

Submitted November 17, 2025 – Decided February 9, 2026

Before Judges Walcott-Henderson and Bergman.

On appeal from the Superior Court of New Jersey, Chancery Division, Essex County, Docket No. C-000127-21.

Whiteman Law Group, LLC, attorneys for appellants MJS Portfolio I LLC, Woodrow Holdings LLC, and Mahir Allan (Brian L. Whiteman, on the brief).

Respondents have not filed a brief.

PER CURIAM

A-0501-24

This one-sided appeal involves disputes arising from the simultaneous sale of seven rental investment properties located in Newark and Irvington in 2021. Plaintiffs[1] alleged the sale to defendants for the purchase price of $2.75 million was structured as a "double closing" with an initial payment of $1.8 million to be paid at the first closing, followed by a payment of the remaining $950,000 at a second closing. Plaintiffs initiated a complaint alleging defendants[2] failed to attend a second closing or pay the $950,000 balance due, leading to multiple claims, crossclaims, third and fourth-party claims between the numerous parties and connected entities involved in the sale.

Plaintiffs appeal the trial court's order dismissing their claims against all defendants pursuant to Rule 4:37-2(b) based on the equitable doctrine of unclean hands. After our careful review of the record, we vacate the dismissal order and remand for a new trial for the reasons expressed hereafter.

---

[1] "Plaintiffs" collectively refer to Mahir Allan, MJS Portfolio I, LLC, ("MJS") and Woodrow Holdings LLC ("Woodrow").

[2] "Defendants" collectively refer to Shloime Green and associated entities SMGR Holdings LLC ("SMGR"), Greenlight Properties LLC ("Greenlight"), 107 Lonergan Holdings LLC ("Lonergan"), and Asher Blumenberg and his associated entity, East Jersey Properties LLC ("EJP").

A-0501-24

I.

<u>Relevant Background Facts</u>

The following facts were taken from the record providing all legitimate favorable inferences to plaintiffs, the non-moving parties as required by <u>Rule</u> 4:37-2(b). In late 2016 through 2019, plaintiffs Mahir Allan and Jon Musco, in their capacity as fifty percent members of Woodrow, acquired seven rental investment properties in Newark and Irvington. The properties were held collectively under MJS, which was owned solely by Woodrow. In early 2021, MJS, through Allan, sought to sell all the properties for $2.75 million and eventually negotiated the terms of a sale with defendant Shloime Green and his company, Greenlight Properties, for a purchase price in that amount.

On May 5, 2021, Allan and Green entered into a written contract setting the purchase price at $1.8 million, corresponding to the remaining mortgage balance owed by MJS on the collective properties. During negotiations, at the suggestion of Green, the parties agreed to structure the sale of the properties into two transactions and to hold a "double closing" which would split the total purchase price of $2.75 million due to MJS with $1.8 million to be paid at the first closing, followed by a payment of the remaining $950,000 at a second closing, which was to occur immediately following the first, where Greenlight,

4                                                    A-0501-24

the buyer in the first closing, would "flip" or sell the property to a third-party buyer, Lonergan. The record includes documents listing all seven MJS properties on the two closing statements.

The title company, defendant Riverside Abstract, prepared separate but linked files for the anticipated double closing, and also prepared draft settlement statements for both transactions on June 8, 2021, showing the two separate expected prices and prospective buyers. The buyer on the first closing statement reflected SMGR[3] Holdings instead of Greenlight and a sale price of $1.8 million. The second proposed closing statement listed the seller as SMGR and buyer as Lonergan for a price of $2.95 million. After reviewing the closing statements, Allan texted Green requesting that the $950,000 payment due to plaintiffs be shown in the second closing settlement documents and that his or MJS' name be listed as a payee and that not listing his name on the closing statement was a "big problem," and he was "not going to close [because] he 'need[s] transparency.'" Green texted Allan that he would communicate with the title company to list MJS as payee, but it was never completed or further

---

[3] Shmuel Meyer Roth is the sole owner of SMGR and had an agreement with Green to use his entity as a "strawman" for a $10,000 payment. At some point between the first contract date of May 5, 2021 and the June 8 draft settlement statements, Greenlight assigned their contract to SMGR.

A-0501-24

documented. Allan expected that the remaining $950,000 of the purchase price would be distributed to MJS at the second closing between SMGR and Lonergan.

At the time of the first closing on June 14, 2021, as a condition to approve a wire disbursement, Allan requested additional written assurance that the remaining $950,000 would be paid out to MJS after the second closing. In response, Green prepared and both parties signed an agreement reciting that Allan was entitled to all sums above $1.8 million in net proceeds, with a cap of $2.75 million, and that such a sum would be paid after deducting all closing costs and after closing with a prospective purchaser. The agreement used their individual names, did not use the name of any entity, nor was it referenced in the closing documents of either transaction.

The proceeds from the first closing were used to pay off MJS' mortgage, including the principal balance plus prepayment penalty. MJS was required to pay additional funds at the closing to satisfy all settlement charges. The title and closing documents for this transaction, as well as tax certifications, consistently reflected only the $1.8 million "sale price."

After the first closing, from June through August 2021, Allan attempted to communicate with Green concerning the scheduling of the second closing and

A-0501-24

when MJS would receive the $950,000 balance it was owed. Eventually, Green would stop responding and block Allan's number.

On August 11, 2021, without notice to plaintiffs, SMGR sold[4] the properties to EJP[5], an entity affiliated with the Blumenbergs.[6] The purchase price was $2,950,000, funded by a loan of approximately $2.1 million and $950,000 tendered by the buyers. The seller's proceeds from this closing, $1,435,367.15, were paid to entities associated with the Blumenbergs, per an "oral joint venture agreement" between Green and Asher Blumenberg concerning the properties. MJS never received any portion of the $950,000 it claimed was owed from the second closing.

---

[4] The properties were able to be sold notwithstanding a filed lis pendens because the title "rundown" ordered by defendant Meister Abstract (defendants chosen title company, which handled the second closing) had a date cut off of July 26, 2024, prior to the filing of the lis pendens. Therefore, Meister was determined to not have any liability because it had no actual notice and was dismissed from the action.

[5] The second closing, initially listing Lonergan as the Buyer was modified as Green reported "[Lonergan] didn't have any money."

[6] Sara Blumenberg (Asher Blumenberg's mother) is the sole owner of EJP. However, at trial, Green testified he expected himself, Asher Blumenberg, and Isaac Blumenberg (Asher's brother) to move forward each as 33% owners "off paper."

On July 21, 2021, plaintiff Musco filed a verified complaint against several individuals and entities and on October 7, 2021, filed an amended complaint adding additional party defendants. On February 25, 2022, defendant Meister Abstract filed an answer to the amended verified complaint and asserted crossclaims and a Third-Party complaint against Allan, Woodrow, and MJS.

On November 21, 2022, Allan, Woodrow, and MJS filed their answer to the Third-Party complaint, which included a counterclaim, crossclaim, and a Fourth-Party complaint against Sara Blumenberg, Asher Blumenberg, and other individuals. Defendants Green, Roth, Greenlight, SMGR, and 107 Lonergan filed answers to the Fourth-Party complaint on January 3, 2023. Plaintiff Musco then filed a second amended verified complaint on February 28, 2023. Defendants Blumenbergs and EJP filed answers to the second amended complaint and to the Fourth-Party complaint and crossclaims on September 23, 2023, and November 24, 2023 respectively.

Trial commenced on May 2, 2024 and continued over May 7, May 9, May 29, June 17, June 18, July 30, and July 31, 2024. At the May 7 trial, the court granted defendants' motion to dismiss first-party plaintiff Musco's case because Musco had no individual standing to assert claims belonging to MJS since the disputed agreements were with MJS. On July 31, 2024, at the conclusion of

8

plaintiffs' case, defendants moved to dismiss plaintiffs' claims with prejudice pursuant to Rule 4:37-2(b). The trial court heard arguments, raised the equitable doctrine of unclean hands, and directed the parties to submit briefs on the doctrine's application to the case. The record reflects this was a theory raised for the first time by the court and was not part of defendants' motion or listed as an affirmative defense or otherwise in their pleadings.

Trial Court Decision

After written submissions were filed addressing the doctrine of unclean hands, the court entered an order on October 7, 2024, granting defendants' motion for a directed verdict and dismissed all of plaintiff's remaining claims with prejudice pursuant to Rule 4:37-2(b). The court found Allan, acting on behalf of MJS, signed multiple documents under oath stating the sale price was $1.8 million, the documents were relied upon by financial institutions and taxing authorities, and there was no evidence in the record or closing documents of a second closing at a higher sales price. The court found plaintiffs later attempted to enforce a separate "side agreement" with Green that was executed after the closing, which purportedly entitled them to the additional $950,000, but determined this agreement lacked a legal foundation in light of the closing records.

A-0501-24

Central to the court's reasoning was the doctrine of unclean hands. The court noted that plaintiffs, specifically Allan, made false statements to both the lender and the taxing authorities by representing the purchase price of $1.8 million was the full consideration paid, despite seeking to recover $2.75 million in his complaint. The court determined that equity cannot be used to divide the proceeds of a tainted or fraudulent transaction, nor allow any party to benefit from their own wrongdoing. The court found that even if defendants may have acted improperly, plaintiffs' conduct in misrepresenting the full purchase price under oath and withholding material information barred them from any relief.

Ultimately, the court concluded permitting plaintiffs' claims to proceed would make the court an instrument of injustice and undermine the principles of equity and public policy. Plaintiffs' deliberate and repeated misrepresentations invalidated their case, and the court dismissed their complaint with prejudice and denied plaintiff of any remedy for the purported side agreement or the alleged remaining purchase price.

On appeal, plaintiffs contend the trial court's decision was not supported by the evidence at trial and was based on several factual inaccuracies. They also claim the undisputed intent and agreement among all parties was for MJS to sell seven properties for a total price of $2.75 million, broken into two simultaneous

10

closings: one for $1.8 million and the next closing wherein the property would be "flipped" for a price of $2.95 million where plaintiffs would be paid the remaining $950,000. Plaintiffs maintain that although the first closing occurred for $1.8 million, the second closing never took place and $950,000 is owed to them. Plaintiffs argue the evidence they presented at trial—including the testimony of Green—confirmed these facts and supported their claims. The plaintiffs further assert the trial court erred by giving undue weight to the manner in which the $950,000 contract was drafted, noting that it was intentionally prepared by defendants in individual names under the guise it would assist in their financing, but its true purpose was to inhibit enforcement of the agreements. They also claim they had no part in nor any reasons to structure the contract in that manner and were not trying to defraud any person or entity.

Plaintiffs also contend the trial court misapplied the doctrine of unclean hands both substantively and procedurally. They argue there were sufficient disputed issues raised at trial that precluded a directed verdict being granted in favor of defendants. They assert their conduct was not intentionally fraudulent or deceptive, especially in relation to the sale structure and communications with their lender, and that any alleged errors—such as not disclosing the second

A-0501-24

contract to the lender—were, at worst, innocent mistakes. Moreover, they highlight defendants never asserted unclean hands as an affirmative defense in their pleadings and that the alleged wrongdoing by MJS was not sufficiently connected to the subject matter of the dispute (i.e., the unpaid purchase price) to justify equitable relief being denied by directed verdict.

Plaintiffs further argue the trial court failed to address the comparative culpability of the parties in its application of the doctrine. They contend the evidence at trial demonstrates sufficient issues of fact that defendants orchestrated a "double closing" and had a history of such schemes, using the structure to minimize out-of-pocket expenses while intentionally planning not to pay the second agreed-upon sum. They maintain sufficient evidence was presented showing defendants engaged in fraud and civil conspiracy, and application of the unclean hands doctrine in favor of such wrongdoers is contrary to good conscience and settled equity principles. They also assert that even if unclean hands were applicable, it only bars equitable relief, not legal remedies such as contractual damages—yet the trial court dismissed all their claims against all defendants with prejudice.

12

II.

The standard applicable to a motion for a directed verdict is equivalent to that for summary judgment. Frugis v. Bracigliano, 177 N.J. 250, 269-70 (2003). The standards of Rule 4:37-2(b) require the court to deny such motions if reasonable minds could differ after "accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can be reasonably and legitimately deduced therefrom . . . ." Smith v. Millville Rescue Squad, 225 N.J. 373, 397 (2016) (quoting Verdicchio v. Ricca, 179 N.J. 1, 30 (2004)). The court should only grant the motions where no rational juror could find that the plaintiff made a prima facie case of the cause of action. Ibid. We review de novo a trial court's decision on these motions, applying the same standard as the trial court. Ibid. The same standard applies on appeal. Samolyk v. Berthe, 251 N.J. 73, 78 (2022); Stewart v. N.J. Tpk. Auth./Garden State Parkway, 249 N.J. 642, 655 (2022).

We first address plaintiffs' contention the court erred in applying the doctrine of unclean hands as its basis to grant defendants' Rule 4:37-2(b) motion. Unclean hands is an equitable doctrine under which relief is denied "to one who is a wrongdoer with respect to the subject matter in suit." Borough of Princeton

13

v. Bd. of Chosen Freeholders, 169 N.J. 135, 158 (2001); see also A. Hollander & Son v. Imperial Fur Blending Corp., 2 N.J. 235, 247 (1949). However, its application "should not be used as punishment but to further the advancement of right and justice." Pellitteri v. Pellitteri, 266 N.J. Super. 56, 65 (App. Div. 1993). It may bar "the special remedies of equity, [but] does not deny legal rights," nor is it triggered by general misconduct unrelated to the act in question. Capparelli v. Lopatin, 459 N.J. Super. 584, 612 (App. Div. 2019); Med. Fabrics Co. v. D.C. McLintock Co., 12 N.J. Super. 177, 180 (App. Div. 1951).

Sua sponte invocation of the doctrine of unclean hands is permitted only with clear evidence of serious misconduct, and in the interest of equity and justice. Trautwein v. Bozzo, 39 N.J. Super. 267, 268 (App. Div. 1956).

> The[] doctrine[] of unclean hands . . . [is] flexible in [its] application, turning largely on the circumstances involved in the 'total situation.' . . . [It] may turn, too, upon the relative innocence or culpability of the plaintiff and defendant, for the law may aid the one who is comparatively the more innocent.
>
> [Untermann v. Untermann, 43 N.J. Super. 106, 109 (App. Div. 1956) (citations omitted).]

"It is the effect of the inequitable conduct on the total transaction which is determinative whether the maxim shall or shall not be applied." Untermann v. Untermann, 19 N.J. 507, 518 (1955).

14

After our review of the record, we determine the trial court misapplied its discretion in dismissing plaintiffs' claims based on the doctrine of unclean hands. When reviewing the evidence presented in plaintiffs' case as true and providing all favorable legitimate inferences therefrom as required by Rule 4:37-2, plaintiffs' evidence showing defendants committed wrongful acts in order to defraud plaintiffs' monies due from the "second closing" required a denial of defendants' motion. The court was required to take plaintiffs' allegations as true, if supported by competent evidence.

Plaintiffs' evidence, including both Allan's and Green's testimony, when provided all favorable inferences, shows Green and the other defendants colluded to defraud plaintiffs of the $950,000 owed from the "second closing." This evidence must be considered as true. Therefore, we conclude genuine issues of material fact existed in the trial record at the close of plaintiffs' case that all or some of the defendants were liable for plaintiffs' loss.

The court determined Allan's claim the sale price was "$2.75 million [flied] in the face of his sworn statements directed to a lender and taxing authorities that the sale price was $1.8 million" and that Allan made "brazen misrepresentations under oath in the closing documents that the total sale price for the properties was $1.8 million" to support the dismissal order. We differ

regarding the weight given by the trial court surrounding Allan's actions in support of its invocation of the doctrine of unclean hands against plaintiffs. We conclude sufficient evidence existed in the record concerning defendants' wrongdoing, which the trial court was required to consider before invoking the doctrine of unclean hands against plaintiffs only. Even assuming the record exhibited that plaintiffs committed some wrongdoing, it also contained significant evidence of defendants' wrongdoing by colluding to defraud plaintiffs of $950,000 from the "second closing." The record also reflects that defendants sold the property shortly after the first closing for $2.95 million with a profit of approximately $1.1 million, a significant gain that supports plaintiffs' assertions that the market value of the property was in line with the $2.8 million dollar sales price alleged to have been agreed to by Green and his affiliated entities.

When weighing the equities between the parties based solely on the evidence before the court at the time of the motion, we conclude the court failed to consider the "total situation" and the respective "culpability of the plaintiff and defendant," because "the law may aid the one who is comparatively the more innocent." Untermann, 43 N.J. Super. at 109. Sufficient evidence of defendants' wrongful conduct, which was one of the bases of plaintiffs' complaint, was

adequately shown under the auspices of Rule 4:37-2 and required a denial of defendants' motion.

In addition, although we agree with the court's determination that it "cannot be used to settle a score between wrongdoers," in this instance when taking as true all the evidence supporting plaintiff's claims, and providing plaintiffs the benefit of all inferences which can be reasonably and legitimately deduced therefrom, we conclude the doctrine of unclean hands was improvidently utilized by the court against plaintiffs. Under the liberal standards accorded to the non-moving party under Rule 4:37-2, the evidence in plaintiffs' case was sufficient to show that defendants defrauded plaintiffs out of $950,000, thereby enriching themselves while plaintiffs were left in a deficit position after satisfying the loan on the properties.

We further conclude that the sua sponte invocation of the doctrine of unclean hands by the court failed to provide sufficient notice to plaintiffs, denying them due process. The record reflects the unclean hands issue was not raised in defendants' pleadings or at trial. Although after the court raised this issue, we recognize it permitted briefing by the parties, we determine this allowance was insufficient to provide plaintiffs sufficient notice and an opportunity to present evidence to fairly address the issue.

    A-0501-24

Due process requires "that a party in a judicial hearing receive 'notice defining the issues and an adequate opportunity to prepare and respond.'" H.E.S. v. J.C.S., 175 N.J. 309, 321 (2003) (quoting McKeown-Brand v. Trump Castle Hotel & Casino, 132 N.J. 546, 559 (1993)). Without proper notice, "[t]here can be no adequate preparation where the notice does not reasonably apprise the party of the [claims], or where the issues litigated at the hearing differ substantially from those outlined in the notice." Id. at 322 (quoting Nicoletta v. N. Jersey Dist. Water Supply Comm'n, 77 N.J. 145, 162 (1978)).

Additionally, plaintiffs dispute the trial court's finding that their failure to report the full purchase price to their lenders resulted in them obtaining a benefit of a lesser pre-payment penalty. We determine plaintiffs were not provided sufficient time to respond to the trial court's invocation of the unclean hands doctrine and were not provided reasonable time to provide evidence through documents or testimony from a representative of their lender showing they did not obtain any significant benefit based on the alleged double closing structure.

We further determine the transfer tax payable for the additional $950,000 was not due at the time of the first closing. Therefore, Allan's explanation for his signature on tax documents that the sale price was $1.8 million for transfer tax purposes had sufficient plausibility and was required to be considered as true

under Rule 4:37-2. His belief the transfer tax on the $950,000 sale would be paid at the second closing was also plausible. The record also reflects the absence of reasons concerning the failure to hold a N.J.R.E. 104 hearing regarding the unclean hands issues. Accordingly, we conclude the court's failure to provide plaintiffs sufficient notice and an adequate time to respond to its invocation of the doctrine of unclean hands constitutes an abuse of discretion.

Because we conclude the court's concerns surrounding the wrongdoing allegedly committed by a number of parties are valid, we leave to the court's discretion, after hearing the evidence, whether to report any parties, individuals or entities to the proper law enforcement, tax, or other authorities or agencies. See State v. Brady, 452 N.J. Super. 143, 169 (App. Div. 2017). In Brady, Judge Messano, writing for a unanimous court, stated:

> In Sheridan v. Sheridan, 247 N.J. Super. 552, 565 (Ch. Div. 1990), while recognizing the absence of any controlling court rule or administrative directive, the [court] observed that most judges report "illegal or improper activities . . . because it is the right thing to do and because it is repugnant to their oath that judges sit mute in the face of acknowledged, demonstrated or potential wrongdoing." Notably, in Sheridan, the judge became aware of criminal wrongdoing during sworn testimony in a case over which he was presiding, i.e., while the judge was performing an official duty. Id. at 563.
>
> [Ibid.]

We are further constrained to remand for a new trial before a different judge. See R.L. v. Voytac, 199 N.J. 285, 306 (2009) (holding when a "trial court previously made credibility findings, [it is] deem[ed] [] appropriate that the matter be assigned to a different trial court"). We direct the trial court to hold a case management conference within thirty days from its receipt on remand to determine if further discovery or other proceedings are necessary before a new trial is held.

Vacated and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hurley

Clerk of the Appellate Division